Jorgen D. Bering and Winifred E. Bering v. Commissioner.
Bering v. Commissioner
Docket No. 3979-67.
United States Tax Court
T.C. Memo 1968-253; 1968 Tax Ct. Memo LEXIS 47; 27 T.C.M. (CCH) 1338; T.C.M. (RIA) 68253; October 30, 1968, Filed. *47 Jorgen D. Bering, pro se, 11852 Occidental Rd., Sebastopol, Calif. Robert M. Zimmerman, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax of petitioners in the amounts of $13,934.31 and $33.60, respectively, for the years 1963 and 1964. Petitioners concede their tax liability for 1964. The sole issue in this case is whether the petitioner, Jorgen D. Bering, is entitled to apply the tax limitation provisions of section 1302, I.R.C. 1954, [1] in computing his income tax liability for the taxable year 1963. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Jorgen D. Bering and Winifred E. Bering, petitioners herein, are husband and wife. They resided in Sebastopol, California, at the time they filed their petition herein. Winifred E. Bering is a party to this action only because she filed joint income returns with her husband. Accordingly, *48 Jorgen D. Bering will hereinafter be referred to as the petitioner. The joint income tax returns of petitioners for the years 1959 to 1964, inclusive, were filed with the district director of internal revenue, San Francisco, California. Petitioner Jorgen D. Bering is an industrial engineer and an inventor. He has obtained several patents in food processing machinery, including a patent on a valve seat design suited to extreme sanitary conditions. The principal feature of this design is a double line seal whereby a spherical plug comes into contact against both a cylinder and a cone section. The patent includes generic claims for stainless steel drain valves designed to overcome the surface quality of stainless steel which causes surfaces of it to stick together in juxtaposition. This sticking constitutes an operational hazard in valves, which operate by pushing metal surfaces together, and particularly in self-actuating valves (not actuated by outside forces) such as float valves, pressure and vacuum relief valves and check valves. During 1959 and 1960, petitioner unsuccessfully attempted to interest others in manufacturing his valves on a royalty basis. To exploit his invention, *49 then, he engaged various shops to manufacture valve parts. Petitioner assembled the parts and sold the assembled valves. This method of doing business was conducted during 1959, 1960 and 1961 on a small scale and at a regular loss. Toward the end of 1961 the American Can Company and the Ex-Cell-O Corporation, the two largest makers of milk filling equipment in the United States, adopted petitioner's float valves in their milk filling equipment. These companies had previously manufactured their own valves. They were in a position to manufacture the petitioner's valves, but expressed no interest in doing so on a royalty basis. The adoption of his valves by these customers meant a suddenly expanded market. Arrangement for an adequate supply of valves proved difficult. As a result of this, and because of the inefficiency in having parts assembled by numerous shops, petitioner began to manufacture the valves himself. It was not until March 1963 that the manufacturing, now largely operated by the petitioner, was brought to a reasonable 1339 state of competence, and that a substantial level of net manufacturing income was reached. Each valve manufactured and sold contained the identical *50 patented valve seat design. About 90 percent of the total production was in float valves, and 84 percent of these valves were purchased by American Can and Ex-Cell-O, and related concerns. Petitioner manufactured and sold four types of valves during the period 1959 through 1964. Each valve came in several sizes. The differences in the types and sizes of the valves, each containing the identical patented valve seat design, allowed the patented feature to be employed in different manufacturing applications. A principal reason for the price variation between one valve size and another was the amount of material and labor needed to produce it. During the period 1959 through 1964, petitioner sold 970 valves as follows: Year
Number of Valves Sold
1959
40
1960
40
1961
100
1962
295
1963
412
1964
83
Total
970
The number of valves sold by petitioner during 1963 constitutes 42.47 percent of the total number of valves sold during the period 1959 through 1964. The following schedule sets forth a breakdown of business income information, including amounts computed by petitioner in making out his returns, and as corrected to reflect the uncontested statutory *51 notice adjustments by the Commissioner. The percentage of the 1963 gross receipts to the total gross receipts for all years is set forth. Similar comparisons have been made for gross profit figures, etc., as shown. 1340 SCHEDULE OF BUSINESS
OPERATIONS CONCERNING THE
MANUFACTURE AND SALE OF
PATENTED VALUES
1959
1960
1961
1962
Gross Receipts Per Return
$7,442.60
$7,182.50
$11,708.00
$64,277.79
"Cost of Goods Sold" Per
5,757.90
4,270.74
5,729.38
39,885.50
Return, Including Amounts
Labeled "Income from In-
vention"
Gross Profit Per Return
1,684.70
2,911.76
5,978.62
24,392.29
Add: Amount Labeled
0
0
0
5,272.67
"Income from Invention"
which peti- tioner
Deducted as Cost of Goods
Sold
Gross Profit from
1,684.70
2,911.76
5,978.62
29,664.96
Business Operation Before
Deduction for "Invention
Gross Income"
Net Profit (or Loss) Per
Return
(2,807.67)
(2,166.33)
( 703.60)
6,761.70
Add: "Income from In-
0
0
0
5,272.67
vention" Per Above
Net Profit (or Loss) from
(2,807.67)
(2,166.33)
( 703.60)
12,034.37
Business Operation Before
Deduction for "Invention
Gross Income"
Add: Uncontested
0
0
0
0
Statutory Notice
Adjustments Relating to
Business Operations
Net Profit (or Loss) as
[2,807.67)
[2,166.33)
[703.60)
$12,034.37
Corrected
*52 SCHEDULE OF BUSINESS
OPERATIONS CONCERNING THE
MANUFACTURE AND SALE OF
PATENTED VALUES
1963
Percentage
1963
1964
TOTALS
to Total
Gross Receipts Per Return
$169,887.61
$38,739.00
$299,237.67
56.77
"Cost of Goods Sold" Per
124,521.76
16,828.70
196,993.98
Return, Including Amounts
Labeled "Income from In-
vention"
Gross Profit Per Return
45,365.85
21,910.47
102,243.69
44.37
Add: Amount Labeled
51,603.21
0
56,875.88
Exceeds
"Income from Invention"
80.00
which peti- tioner
Deducted as Cost of Goods
Sold
Gross Profit from
96,969.06
21,910.47
159,119.57
60.94
Business Operation Before
Deduction for "Invention
Gross Income"
Net Profit (or Loss) Per
Return
10,000.00
3,303.55
20,065.25
Add: "Income from In-
51,603.21
0
56,875.88
vention" Per Above
Net Profit (or Loss) from
61,603.21
3,303.55
76,941.13
Exceeds
Business Operation Before
80.00
Deduction for "Invention
Gross Income"
Add: Uncontested
7,115.65
2,984.25
10,099.90
Statutory Notice
Adjustments Relating to
Business Operations
Net Profit (or Loss) as
$68,718.86
$ 6,287.80
[1] $87,041.08
78.94
Corrected
*53 Opinion Petitioner received $96,969.06 gross income in 1963 from the manufacture and sale of valves incorporating his patented valve seat design. He seeks the benefit of section 1302, as applicable to years ending prior to January 1, 1964, [2] so far as it may provide a limitation on tax of some portion of this amount. There is no suggestion that the amount thus received in 1963 did not relate to operations, i.e., manufacturing and selling, conducted during that year. The claim to relief under section 1302 is based exclusively upon the facts that the manufactured article had been patented, that the period of time during which the petitioner conceived and developed his invention was in excess of 24 months, and upon petitioner's claim that gross income in respect of his invention for the taxable year 1963 is not less than 80 percent of the gross income in respect of the invention in the taxable year plus the gross income therefrom in previous taxable years and the 12 months immediately succeeding the close of the taxable year 1963. *54 The problem in this case is that the parties cannot agree as to the computation of gross income in respect of the invention. The difficulty arises because petitioner's gross income from his invention (whatever it be, if anything) was not derived from royalties as in the usual case where an inventor sells or assigns a patent in an arm's-length transaction for a certain or computable amount and receives royalties from the sale of the patented items on a per unit or other contractual basis. Rather, petitioner chose to exploit his invention by manufacturing and selling valves on his own which contained his patented feature. He contends that an inventor who engages in the manufacture and sales of a patented item should be entitled to the same benefit, with respect to income from his invention, that section 1302 accords an inventor who licenses another to manufacture the patented items. In other words, that portion of gross income from the manufacture and sales of the patented valves which represents income from the invention, if it otherwise qualifies, should be subject to section 1302's limitation on tax. The Commissioner does not contend otherwise; nor do we think the Congress intended *55 to discriminate against the inventor-manufacturer. As this Court stated in Alfred W. Barber, 19 T.C. 600, 603: Of course, if it could be shown that some portion of the 1945 income from the manufacture and sale of the * * * [patented items] was allocable to the patent, then there would be a basis for the application of * * *, but only to that extent. The problem here, as in Barber, is that the taxpayer must show what portion, if any, of the income from the manufacture and sale of the patented items was allocable to the patent. This amount must be computed for the taxable year in question, 1963, in order to arrive at the amount of income that is subject to the tax limitation of section 1302. This amount must also be computed for the previous taxable years and for the 12 months immediately succeeding the close of the taxable year 1963 in order to determine whether the amount in respect of the invention includable in gross income for the taxable year 1963 is not less than 80 percent of the total of such amounts for the years 1959 through 1964. If it is less than 80 percent, no amount of income is subject to the tax limitation of section 1302. Whether the petitioner *56 received, in 1963, 80 percent of the total gross income in respect of his invention received during 1342 1959 through 1964 is a question of fact. The burden is upon the petitioner to prove it. We hold petitioner has failed to meet his burden of proof on this issue and that none of his 1963 income is entitled to the tax limitation under section 1302. While petitioner has demonstrated that his patent was of significant value and that some portion of his 1963 income was income in respect of his invention, we have no evidence before us from which we can conclude that 80 percent of all such income for the years 1959 through 1964 was includable in petitioner's 1963 gross income. The petitioner has proffered no rational method of computing gross profit from his invention that would indicate he has met the 80 percent requirement. We think at least that much is required by the statute. The petitioner's brief maintains that while section 1302 should be administered with "intelligence and sympathetic understanding," "the purpose and the spirit of the Section" is "entirely negated by [the Commissioner's] categorical hostility," presumably in requiring petitioner to demonstrate this *57 requirement has been met. We are not permitted to ignore that requirement. Decision will be entered for the Commissioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
1. Does not include losses.↩
2. SEC. 1302. INCOME FROM AN INVENTION OR ARTISTIC WORK. (a) Limitation on Tax. - If - (1) an individual includes in gross income amounts in respect of a particular invention or artistic work created by the individual; and (2) the work on the invention or the artistic work covered a period of 24 months or more (from the beginning to the completion thereof); and (3) the amounts in respect of the invention or the artistic work includible in gross income for the taxable year are not less than 80 percent of the gross income in respect of such invention or artistic work in the taxable year plus the gross income therefrom in previous taxable years and the 12 months immediately succeeding the close of the taxable year, then the tax attributable to the part of such gross income of the taxable year which is not taxable as a gain from the sale or exchange of a capital asset held for more than 6 months shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over, in the case of an invention, that part of the period preceding the close of the taxable year or 60 months, whichever is shorter, or, in the case of an artistic work, that part of the period preceding the close of the taxable year but not more than 36 months. (b) Definitions. - For purposes of this section - (1) Invention. - The term "invention" means a patent covering an invention of the individual.↩